UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

THOMAS O'BRIEN,

Plaintiff,

v.

MORGAN STANLEY DW, INC. et al.,

Defendants.

3:07-CV-00046-LRH-VPC

ORDER

Presently before the court is defendants Morgan Stanley DW, Inc. ("Morgan Stanley"), Gary Elrod, R. Scott Gross, Seana Scott, and Tyler Whitten's motion for summary judgment (#32[1]). Plaintiff Thomas O'Brien has filed an opposition (#43) to which defendants replied (#46).

## I. Facts and Procedural History

This case concerns plaintiff Thomas O'Brien's termination by his former employer, defendant Morgan Stanley. Plaintiff was formerly employed by defendant Morgan Stanley[2] beginning in 1979 as a financial advisor in Morgan Stanley's Reno branch. During the course of his employment, plaintiff received numerous reprimands for making inappropriate comments. The first of these was

---

[1]Refers to the court's docket

[2]Plaintiff was originally hired by Dean Witter Reynolds, Inc. (Scott Decl. (#34) ¶ 4.) In 1997, Morgan Stanley and Dean Witter merged, forming Morgan Stanley DW, Inc. (*Id.*) In 2007, Morgan Stanley DW, Inc. became Morgan Stanley & Co., Inc. (*Id.*)

in 1994 when plaintiff received a written reprimand from the Reno branch manager. This reprimand states that while some facts were in dispute, plaintiff "made various remarks to employees about other employees['] personal relationships, using offensive language." The reprimand further states that plaintiff "inappropriately commented on other employees' appearances" and "used physical gestures that are offensive." The reprimand ends with the statement, "Any future credible complaint regarding your conduct as a Dean Witter employee will subject you to further disciplinary action, up to an [sic] including termination."

In October 2004, plaintiff received another reprimand for inappropriate comments. In this instance, plaintiff told an African American employee that she reminded him of Aunt Jemima. Plaintiff was advised that further disciplinary action would result if he failed to show immediate, significant, and sustained improvement in his conduct.

In August 2006, Lisa Carpenter, a trainee at the Reno branch, submitted an incident report to defendant Seana Scott, a Human Resource Generalist for Morgan Stanley. The incident report states that on August 7, 2006, plaintiff told Carpenter that during his earlier years with Morgan Stanley, "they started hiring minorities and women intentionally over the white male as to make the company look better" and that one Morgan Stanley branch hired an unqualified black man who went on to shoot and kill his branch manager. The report also states that plaintiff sarcastically stated he wished the same thing would happen to their current branch manager and that if Carpenter were willing, plaintiff would supply the gun. The report further states plaintiff made a lewd reference to a young female financial advisor and commented that things were going to change and implied that Carpenter would not be included in the changes.

After receiving this report, Scott called Carpenter to get additional details about the alleged incident. Carpenter told Scott that the conversation with plaintiff was lengthy and made her feel uncomfortable and that plaintiff told her she would not make it like the other "hot young thing" in the office. Carpenter also told Scott that she was concerned about coming forward because she was new

to the firm and did not want plaintiff to retaliate against her.

After speaking with Carpenter, Scott reported the complaint to district manager Bob Magel. On August 25, 2006, Magel and Scott set up a conference call with defendant Gary Elrod, the Reno branch manager, and Scott Gross, the assistant manager in Reno. During the conference call, Elrod asked plaintiff to come into Elrod's office. Scott asked plaintiff if he recently had any conversations with Carpenter. Plaintiff denied any recollection of a conversation with Carpenter and also denied knowing who Carpenter was.

Scott then confirmed the conversation with Carpenter to make sure it involved plaintiff. Subsequently, Scott asked plaintiff again whether he recalled having a conversation with Carpenter. Plaintiff again denied any recollection of a conversation with Carpenter but stated that if he had said anything to her, it would have just been in passing. After these events, Scott and Magel determined plaintiff should be suspended while Scott investigated the situation further.

During plaintiff's suspension, Scott spoke with three other employees to determine if they had observed plaintiff conversing with Carpenter. Each of these employees stated that they had seen plaintiff talking with Carpenter on multiple occasions. The employees also reported additional instances of inappropriate comments by plaintiff.

Based on plaintiff's prior discipline for making inappropriate comments and the confirmation from other employees that plaintiff had conversations with Carpenter, Scott determined that Carpenter's complaint was credible. Based on this finding, Scott concluded that plaintiff had violated Morgan Stanley policies regarding workplace conduct and professionalism. Scott reported her findings to Magel; and Scott and Magel jointly decided to fire plaintiff. Plaintiff's termination was effective September 1, 2006.

On September 20, 2006, plaintiff began working for Avisen Securities. Plaintiff brought to Avisen a partial list of clients he served while at Morgan Stanley. Plaintiff called some of these clients while working at Avisen. Avisen fired plaintiff after five days of employment.

## II. Legal Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

In order to successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at 252.

. . .

## III. Discussion

### A. Conspiracy to Commit Fraud

Plaintiff's first claim for relief alleges defendants "devised a scheme or conspiracy to intentionally take asset portfolios developed by other successful brokers." (Compl. (#1) ¶ 34.) While plaintiff does not denominate this claim as civil conspiracy, it appears that civil conspiracy would be the only theory that could support the allegations in this claim.

"An actionable civil conspiracy consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts." *Consolidated Generator-Nevada, Inc. v. Cummins Engine Co.*, 971 P.2d 1251, 1256 (Nev. 1998) (internal quotation marks omitted). "Agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage." *Collins v. Union Fed. Sav. & Loan Ass'n*, 662 P.2d 610, 622 (Nev. 1983). Moreover, agents of a corporate principal cannot conspire with each other unless they are acting for their individual advantage as opposed to their principal's advantage. *See id.*

In the present case, there is no evidence that any of the named defendants[3] acted as individuals for their own advantage. At the time of the alleged conspiracy, all of the individual defendants were employees of Morgan Stanley. (Scott Decl. (#34) ¶ 2; Magel Decl. (#35) ¶ 14.) While plaintiff alleges in his complaint that defendants created a scheme to "solicit [plaintiff's] customer base making false representations that [plaintiff] had done something 'horribly wrong' and/or had retired," plaintiff has presented no evidence that any of the defendants sought to secure any benefit by having plaintiff fired. For instance, there is no evidence that any of the individual defendants sought to receive commissions

---

[3]Plaintiff argues in his opposition that Avisen Securities conspired with defendants to subject plaintiff to fraud. Plaintiff, however, has failed to offer any admissible evidence to show defendants had any communication with Avisen.

from clients that plaintiff previously served[4] or that Morgan Stanley itself was in a better financial position after plaintiff was fired. Therefore, because plaintiff has not shown he can present admissible evidence in support of an essential element of his civil conspiracy claim, summary judgment is granted to defendants on this claim.

**B. Breach of Contract**

Plaintiff's second claim for relief alleges that "Morgan Stanley had an oral contract to provide services to Mr. O'Brien as a broker and his clients" (Compl. (#1) ¶ 47), but Morgan Stanley breached this contract (*Id.* ¶ 50). Plaintiff further alleges that his employee handbook "provided for a hearing process when accused of misconduct within the office," but plaintiff was not afforded "procedures normally required before terminating a Morgan Stanley employee . . . ." (*Id.* ¶¶ 52, 53.)

The only evidence regarding any of the defendants' views as to the length of plaintiff's employment is plaintiff's deposition testimony that David Demming and Steve Miller, management at Morgan Stanley, told him, respectively, "you can work here until you retire" and "I look forward to having you for the rest of your career." (O'Brien Dep. (#36) Ex. A at 228:22-229:4.) This evidence is insufficient as a matter of law to show that plaintiff had an employment contract with Morgan Stanley.

All employees in Nevada are presumed to be at-will. *Am. Bank Stationery v. Farmer*, 799 P.2d 1100, 1101 (Nev. 1990). "An employee may rebut this presumption by proving by a preponderance of the evidence that there was an express or implied contract between his employer and himself that his employer would fire him only for cause." *Id.* at 1101-02. Uncorroborated assertions by an employee alleging the existence of a long-term employment contract do not overcome the presumption of at-will employment. *Yeager v. Harrah's Club, Inc.*, 897 P.2d 1093, 1096 (Nev. 1995).

---

[4]In his deposition, plaintiff testified that he heard from a former client that Elrod called the client and told him that "if you were my account, I would have given you a discount." (O'Brien Dep. (#36) Ex. A at 322:8-14.) Aside from being inadmissible hearsay, this statement does not show Elrod would have served as a financial advisor to this client (Elrod is a branch manager), let alone that Elrod would have received from any commission from this client had the client remained with Morgan Stanley.

In the present case, plaintiff presents nothing more than the type of uncorroborated promises the Nevada Supreme Court has deemed insufficient to create anything more than an at-will employment contract. In *Yeager v. Harrah's Club, Inc.*, a plaintiff brought a breach of contract action against his former employer, Harrah's, based upon his testimony that he was promised, "I'd be at Harrah's until I retired" and that he received other oral assurances of lifetime employment. *Id.* at 1095 n.4. The court held these promises were insufficient as a matter of law to establish a long-term employment contract. Here, plaintiff's testimony that he was told he could work at Morgan Stanley until he retired and that one of his managers said he looked forward to having plaintiff for the rest of his career are, at best, the same sort of uncorroborated promises rejected in *Yeager*. Plaintiff's employment was therefore at-will and cannot support a breach of contract claim.

Plaintiff also alleges Morgan Stanley breached a contract by denying him certain procedures. Although plaintiff does not specify in his complaint what these procedures were, he testified in his deposition that he believed Morgan Stanley did not follow its procedures when (1) he was not permitted to have his attorney present during the meeting in which he was presented with Lisa Carpenter's allegations, and (2) he was not warned about an investigation and the cause of this investigation. (O'Brien Dep. (#36) Ex. A at 289:24-291:11.) Plaintiff, however, fails to provide any evidence of a contract that provided him these rights. Summary judgment is therefore granted on plaintiff's breach of contract claim.

**C. Breach of the Implied Covenant of Good Faith and Fair Dealing**

Plaintiff's third claim for relief, alleging that Morgan Stanley breached the implied covenant of good faith and fair dealing, necessary fails because plaintiff's employment contract with Morgan Stanley was at-will. *See Martin v. Sears, Roebuck & Co.*, 899 P.2d 551, 555 (Nev. 1995) (holding that a claim for bad faith discharge in violation of the implied covenant of good faith and fair dealing cannot succeed when an employment relationship is at-will). Summary judgment is therefore granted on this claim.

**D. Defamation**

Defendants move for summary judgment on plaintiff's defamation claim on the basis that it is not supported by competent evidence. "In order to establish a prima facie case of defamation, a plaintiff must prove: (1) a false and defamatory statement by defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Simpson v. Mars Inc.*, 929 P.2d 966, 967 (Nev. 1997).

In opposition to defendants' motion, plaintiff argues that "[t]he deposition testimony of Elrod, Mortensen, and Witten, [sic] Seana Scott, and the attached letter of Mr. Omel prove that Mr. O'Brien was subject to a barrage of defamation designed to destroy his credibility . . . ." (Opp'n (#43) at 19.) Plaintiff further argues that "the Carpenter letter" and "Scott's fraudulent investigation confirm defamation of an egregious level." (*Id.*) Finally, Plaintiff argues that "[t]he Defamatory Statements on [his] U-4 and U-5 are not absolutely privileged." (*Id.* at 20.)

**1. Deposition Testimony**

The court has reviewed all of the referenced exhibits attached to plaintiff's opposition and can find nothing that would constitute competent evidence of a false and defamatory statement by a defendant concerning plaintiff. With regard to the depositions, the only evidence of a negative statement concerning plaintiff is Gary Elrod's testimony that he had to discipline plaintiff for improper language. (Elrod Dep. (#44), Ex. J at 31:20-31:24.) There is no indication, however, that this discipline involved a defamatory statement or even that plaintiff had been wrongly accused of using improper language. In fact, plaintiff admitted in his deposition that he was disciplined for telling an African American coworker that she reminded him of "Aunt Jemima." (O'Brien Dep. (#36), Ex. A at 112:19-113:14.)

**2. Omel and Carpenter Letters**

With respect to Exhibit K, identified as the "letter dated December 3, 2007 from Wayne D. Omel," the court can only characterize this document as rank hearsay. While the top of this document

states that it is a declaration, Mr. Omel has not provided that the contents of the letter are true under penalty of perjury as required by 28 U.S.C. § 1746. Furthermore, the author of this exhibit does not claim to have personal knowledge of most of the matters set forth therein. This exhibit therefore cannot be considered in opposition to defendants' motion for summary judgment.

With regard to Exhibit E, identified as the "Carpenter letter," this document has no bearing on plaintiff's claims, as it is purportedly authored by Lisa Carpenter, who is not a defendant in this action.

**3. Scott Investigation**

Turning now to "Scott's fraudulent investigation," plaintiff may be referring to Exhibit F attached to the affidavit of Kevin Mirch, which is labeled as a "true and correct copy of an unsigned redacted statement authored by Sean Scott dated August 22, 2006." (Mich Decl. (#44) ¶ 10.) This document, however, is not sufficient to create a prima facie case of defamation because there is no evidence it was ever published to a third party.

**4. U-4 and U-5 Forms**

Finally, although plaintiff makes a brief argument in his opposition that statements in his U-4 and U-5 forms "are not absolutely privileged," plaintiff presents no competent evidence as to what these statements were. Although both the parties discuss the U-4 and U-5 forms in their briefs, at no point did plaintiff present this court with the forms to show that they contained defamatory content. Summary judgment is therefore warranted on plaintiff's defamation claim.

**E. Breach of Pension/Profit Sharing Agreement and Pension/Profit Sharing Fraud**

Plaintiff's fifth claim for relief alleges that plaintiff's "wrongful termination was timed to prevent him from vesting further in the Morgan Stanley pension and profit sharing program" (Compl. (#1) ¶ 89) and further alleges that "certain of [plaintiff's] pension benefits were vesting within 10 days on his 57nth [sic] birthday or shortly before or thereafter" (*Id.* ¶ 88). Defendants move for summary judgment on this claim on the basis that any cause of action for breach or fraudulent deprivation of plaintiff's pension or profit sharing program is both preempted by the Employee Retirement Income

Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA") and defeated by ERISA's provisions. The court agrees.

In his deposition, plaintiff testified that his retirement program involved a 401(k) plan and an Employee Stock Ownership Program. (O'Brien Dep. (#36), Ex. A at 181:8-19.) Both of these qualify as employee benefit plans under ERISA. *See McBride v. PLM Int'l, Inc.*, 179 F.3d 737, 745 (9th Cir. 1999); *Vizcaino v. Microsoft Corp.*, 120 F.3d 1006, 1009 (9th Cir. 1997). As such, plaintiff's sixth claim for relief is preempted by ERISA's prohibition on firing an employee for the purpose of interfering with the employee's benefit plan. *See Campbell v. Aerospace Corp.*, 123 F.3d 1308, 1313 (9th Cir. 1997) (stating that ERISA preempts a claim alleging an "employer terminated the employee to avoid paying benefits or sought to prevent the discharged employee from obtaining benefits . . . .").

ERISA's prohibition on an employer's intentional interference with a benefit under an employee benefit plan is set forth in 29 U.S.C. § 1140 and provides, "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ." 29 U.S.C. § 1140. Defendants argue plaintiff cannot succeed in a claim under this section because neither Scott nor Magel knew anything about O'Brien's benefits under Morgan Stanley's plan. This contention, however, does not necessarily defeat a claim for interference with rights under an employee benefit plan.

In *Ritter v. Hughes Aircraft Co.*, 58 F.3d 454 (9th Cir. 1995), the Ninth Circuit held that the burden shifting scheme used to adjudicate motions for summary judgment in Title VII employment cases also applies to discriminatory discharge cases pursuant to § 1140. *Id.* at 457. Within this scheme, a plaintiff must first establish a prima facie case that his employer fired him in order to interfere with his allocation of future benefits. *See id.* at 458. Temporal proximity between termination and the future accrual of benefits is sufficient to establish a prima facie case. *See id.* If

a plaintiff presents a prima facie case of discriminatory discharge, the burden then shifts to the defendant to show the plaintiff was fired for a nondiscriminatory reason. *See id.* If the defendant offers such a reason, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is a pretext. *See id.*

In the present case, plaintiff has shown a prima facie case of discriminatory discharge under § 1140. Plaintiff has submitted his own declaration stating, "I was terminated by Morgan Stanley . . . ten days before my 57th birthday. I had a pension fund with Morgan Stanley of which the value was set to increase substantially when I reached 57. I did not reach age 57 while employed at Morgan Stanley and therefore did not receive the benefit of the larger pension." (O'Brien Decl. (#45), Ex. A ¶ 16.) The burden therefore shifts to defendants to show a nondiscriminatory reason for plaintiff's discharge. Defendants have done so by presenting evidence that plaintiff was fired for making inappropriate comments to coworkers. (*See* Scott Decl. (#34) ¶¶ 12-13.)[5] Thus, the burden shifts back to plaintiff to demonstrate defendants' proffered reason is a pretext. Plaintiff has failed to do so. In fact, plaintiff does not even renew his allegation that defendants fired him in order to reduce his benefits. Rather, plaintiff states only that "[s]ince [plaintiff's] termination was based upon fraud in an attempt to reduce a Class Action Suit, [plaintiff] is entitled to the benefits he would have received." (Opp'n (#43) at 21.) This assertion is wholly insufficient to rebut defendants' proffered reason for firing plaintiff. Summary judgment on plaintiff's fifth claim for relief is therefore granted.

**F. Intentional Interference with Current Contractual Relationships**

Defendants move for summary judgment on plaintiff's claim for intentional interference with current contractual relationships on the basis that plaintiff did not have any contractual relationships upon which to predicate his claim. The court agrees. In order to succeed in a claim for interference with a current contractual relationship, plaintiff must establish (1) a valid and existing contract, (2) the

---

[5]Scott's statements concerning the complaints she received about plaintiff are not admitted to show the truth of these complaints. However, these complaints are admissible to show Morgan Stanley did not have an improper motive in firing plaintiff. *See Haddad v. Lockheed Cal. Corp.*, 720 F.2d 1454, 1456 (9th Cir. 1983).

defendant's knowledge of the contract, (3) intentional acts intended or designed to disrupt the contractual relationship, (4) actual disruption of the contract, and (5) resulting damage. *J.J. Industries, LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003). In the present case, plaintiff admitted in his deposition that he did not have any side agreements with his clients, but rather the clients' agreements were executed with Morgan Stanley. (O'Brien Dep. (#36), Ex. A at 261:19-22.) As such, because a valid and existing contract held by the plaintiff is an essential element of a claim for intentional interference with current contractual relationships, summary judgment for defendants is granted on this claim.

**G. Intentional Interference with Prospective Contractual Rights**

Plaintiff's final claim for relief alleges that Defendants intentionally interfered with plaintiff's prospective contractual relations with the clients he served while working at Morgan Stanley. In support of his claim, plaintiff submits the deposition testimony of defendant Scott, who responded in the following manner to questioning by plaintiff's attorney:

> Q. Okay. Were you aware that Morgan Stanley had agreed that it would provide a list of all the accounts to terminated employees, as well as employees that had left the firm for any reason as of, I guess, a year less two weeks?
>
> A. You're referring to being able to take client's names?
>
> Q. Yes.
>
> A. Yes.
>
> Q. Okay. And when did that policy go into effect?
>
> A. I believe it was a year ago.

(Scott Dep. (#44) Ex. L at 106.)

Based on this testimony, plaintiff argues that defendants interfered with prospective contractual relationships when they refused to give him a list of the clients he served at Morgan Stanley.

A claim for intentional interference with a prospective contractual relationship is comprised of the following elements: (1) a prospective relationship between the plaintiff and a third party, (2) the

defendant's knowledge of this prospective relationship, (3) the intent to harm the plaintiff by preventing the relationship, (4) the absence of privilege or justification by the defendant, and (5) actual harm to the plaintiff as a result of the defendant's conduct. *Leavitt v. Leisure Sports Inc.*, 734 P.2d 1221, 1225 (Nev. 1987). In this case, plaintiff's testimony that Defendants refused to provide him with a list of his clients at Morgan Stanley does not create a prima facie case of interference with a prospective contractual relationship, because defendant's actions were clearly privileged. *See id.* at 1226 (holding that actions taken by defendants to protect the interests they had acquired via a valid contract were privileged). Here, there is evidence Morgan Stanley had "standard client agreements" with its clients. (Magel Decl. (#8) ¶ 8.) Therefore, refusing to give plaintiff a client list would have been a privileged action in pursuit of Morgan Stanley's own financial interest.

Furthermore, plaintiff has not shown defendants had any independent duty to provide him with a client list. Through the declaration of Robert Magel, district manager for Morgan Stanley, defendants provided evidence that Morgan Stanley entered a protocol in November 2006 whereby "a number of other investments [sic] firms, under which a departing broker who went to work for another firm that is a member of the 'protocol' is allowed to take specified and limited client information." (Magel Decl. (#35) ¶ 9.) Magel goes on to state that "[a]t the time of [plaintiff's] termination, however, Morgan Stanley had not yet joined the protocol." (*Id.*) He also adds that "Avisen Securities is not a member of the protocol." (*Id.*) Thus, even if Morgan Stanley were a member of the protocol when plaintiff was fired, defendants have established they were under no independent obligation to provide plaintiff with a client list because plaintiff never worked for a member of the protocol.[6]

Plaintiff also argues that defendants intentionally interfered with prospective contractual relationships when they called his former clients and "grossly maligned" him in order to prevent his

---

[6] The court acknowledges that in Seana Scott's deposition, she stated she believed Morgan Stanley had entered the protocol in July 2006–two months before plaintiff was fired. (Scott Dep. (#44) Ex. L at 106.) However, plaintiff does not contest that he never worked for a firm that was a member of the protocol; thus, he has not shown he was ever entitled to a list of clients he served while at Morgan Stanley.

clients from searching for his new place of employment. (Opp'n (#43) at 22.) Again, however, plaintiff has not presented any admissible evidence that would show any of the defendants ever called any of his former clients. Therefore, because plaintiff has failed to present a triable issue on his intentional interference with prospective contractual rights claim, summary judgment for defendants on this claim is granted.

**IV. Conclusion**

Plaintiff has failed to show by admissible evidence that he can support any of the claims asserted in this action. Summary judgment for defendants is therefore granted.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment (#32) is GRANTED.

The court clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

DATED this 10th day of September, 2008.

James C. Mahan

JAMES C. MAHAN
UNITED STATES DISTRICT JUDGE